SARAH A. MORRIS, Respondent, v. MARY K. BLUNT, SAMUEL B. KERSEY, JAMES B. KERSEY, WILLIAM HOFFMAN, MARTHA J. HOFFMAN, SAMUEL HOFFMAN, JAMES HOFFMAN, and JOSEPH BLUNT, Administrator of the Estate of Jane Kersey, Deceased, Appellants.

No. 1964. Decided January 20, 1909 (99 Pac. 686).

1. ESCROWS—DELIVERY BY DEPOSITARY—SUFFICIENCY. Evidence *held* to show that a deed of land was placed in escrow by the grantor for delivery to the grantee on his paying the price, and hence a delivery to the grantee, who refused to pay the price, was unauthorized. (Page 202.)

2. VENDOR AND PURCHASER—BONA FIDE PURCHASERS. A purchaser knew at the time of his purchase that his immediate grantors had never had possession of the premises nor had exercised any kind of ownership over the same, and that others were in pos-

session and exercised acts of ownership. The purchaser made no attempt to obtain possession until a considerable time after his purchase. The only consideration paid by him was the giving of a mortgage on the property. *Held*, that he was not an innocent purchaser for value. (Page 202.)

APPEAL from District Court, Third District. *Hon. C. W. Morse,* Judge.

Action to quiet title. From a judgment for plaintiff, defendants appeal.

REVERSED.

*C. W. Collins* for appellants.

*Messrs. Young & Snow* for respondent.

STRAUP, C. J.

The respondent brought this action to quiet title to thirty-five acres of land situate in Salt Lake county. The court made findings and entered a judgment quieting the title in her. It is undisputed that on and prior to the 27th day of June, 1903, Jane Kersey was the owner of the property. She died intestate March, 1904. The appellant Joseph Blunt is the administrator of her estate. The other appellants are her heirs at law. The Home Investment & Savings Company and the Idaho Investment Company are separate corporations. They maintain offices together at Salt Lake City. The principal business of both companies carried on at that place was managed by the same persons. In April, 1903. James B. Kersey, a son of the deceased, entered into a written agreement with the Idaho Investment Company to purchase eighty acres of land in Blaine county, Idaho, for the sum of $800, payable $8 per month. On the 27th day of June, 1903, the deceased executed a deed purporting to convey her property to V. S. Graffam. The question over which the controversy arises is whether the deed made by her was placed in escrow to be delivered only when Graffam paid the con-

sideration agreed by him to be paid, or whether the deed was an absolute conveyance and was given as part payment of the purchase price on the contract entered into between James B. Kersey and the Idaho Investment Company.

The facts, as claimed by the appellants, are: That the deceased listed her land with the Home Investment & Savings Company to be sold. On the 27th day of June, 1903, the deceased and her son, just before leaving Salt Lake county to go to Idaho, where they had intended to remain some time, called at the office of the Home Investment & Savings Company. She was there informed by the person having charge of the business that negotiations for the sale of her land to V. S. Graffam were then pending, and, as she was about to depart from Utah and go to Idaho, it was suggested that she sign a deed conveying the property to Graffam. She executed such a deed and left it with the Home Investment & Savings Company to be delivered to Graffam upon payment of the purchase price, which was $800. She and her son then went to Idaho. Graffam paid $200 of the purchase price. On visiting the premises Graffam was informed by Alfred Blunt, who was then occupying the premises, that he would not surrender immediate possession, and that he demanded reasonable notice to vacate. Thereupon the Home Investment & Savings Company, by R. K. Hardy, wrote Mr. Blunt, on the 27th day of July, 1903, as follows: "The property that you are now occupying, as you were informed, has been sold to Mr. V. S. Graffam. The gentleman informs me that he notified you of this fact, and further that he desires possession. The property he purchased is situated in section 34, township 1 south of range 2 west of Salt Lake meridian, containing thirty-five acres. Mrs. Kersey, before she left, signed a contract of sale and placed in escrow her deed conveying possession to Mr. V. S. Graffam, which said gentleman desires possession immediately or compensation for the use of the above premises." Because he was told by Blunt that he could not have immediate possession, Graffam refused to comply with the terms of his contract of purchase and demanded the re-

turn of the $200 paid by him. He purchased other lands
through the Home Investment & Savings Company, and the
$200 paid by him was applied on that purchase. In reply
to inquiries from the deceased, Hardy also wrote her, at
Blaine county, Idaho, on the 15th day of August, 1903, as
follows: "I had this place sold, as I had told you, and took
a deposit to hold the purchaser till we could have title ex-
amined and deliver him the place. On his going to take
possession of it, however, your tenant refused to give pos-
session of it, and had high words over the matter. Accord-
ingly the purchaser came back and demanded the return
of his money because he could not get possession of the
property. We waited till we found his story was a true
one, that he could not get possession, and then, of course,
returned the money deposited. The purchaser also said that
he was told by the tenant that there were certain things
about the place which would keep him from taking it if he
knew them. Having lost this sale, I have been advertising
your property and have had several parties out to look at it.
One, the present week, said he would take it, and would
bring in the money to make the first payment within a day.
We have waited patiently, but he has not come back. I have
paid particular attention to your land and pushed it with
all my might and main, but with no better results than I
have related. We have already spent twelve dollars buggy
hire taking parties to see your place. To-day the tenant (the
old man) came in and we questioned him as to the meaning
of his actions and talk with the man who went to take the
place. He replied that his family was sick, that he had
no place to go to, and that he was entitled to notice to get
out sufficiently to enable him to cast about him and find
another agreeable place. I am sorry of the unfortunate cir-
cumstances, but couldn't help them. I will continue to work
on the sale. Meantime we hold the deed you signed." On
August 20th he also wrote her: "I have your letter of
August 17th and would say that I wrote you August 15th
very fully in regard to the matter, explaining that the sale

"which I negotiated for you was knocked in the head by the occupant (tenant) of the premises, who refused to give the buyer possession and treated him with great rudeness. I have spent not less than $15.00 since that time taking out customers to see the place, but the intense heat which we have been having has so distressed prospective buyers on the way there that I have not been able to accomplish anything. It is a shame that after having made the sale, that your tenant should have knocked it in the head by refusing to give the buyer possession of the property." The genuineness of these letters is admitted, and the authority of the person writing them is not denied. It is conceded that they were written by the person who negotiated the sale of the deceased's land and with whom the deceased transacted the business and with whom she had left the deed. That the Home Investment & Savings Company had the deceased's property for sale and had sold it to Graffam, but that he refused to carry out the agreement to purchase it, and that the money paid by him was returned because he claimed he was unable to get immediate possession of the premises, is likewise not disputed. Much evidence was given on behalf of the appellants tending to show that the deed made by the deceased was not to be delivered to Graffam until the purchase price of the land was paid.

On behalf of the respondent, the then president and manager of the Idaho Investment Company testified that, when the deceased and her son called at the office, Hardy called to the witness and said that he had sold the deceased's property to Graffam for $800, and that Mrs. Kersey wanted to know "if we would receive this contract as a payment upon land that her son, James Kersey, had bought in Idaho. I asked him if the sale was a sure sale. He said it was. I told him under those circumstances we would be willing to take it if the property was clear. He said it wasn't; that there was a $225 mortgage on it. . . . He said, 'we will hold the deed until Mrs. Kersey and her son pay this mortgage.' I said, 'Under the circumstances, then, I am willing to do it.' He said, 'Shall I make the deed, direct to Mr. Graffam or make

it to you ?' I said, 'You might as well make it to Mr. Graffam, and we will take the proceeds.' . . . . On that date there was $768 unpaid on the note (which James Kersey had given to the Idaho Investment Company). We were to give Mrs. Kersey's son credit on that note for the amount Graffam was paying, in consideration of her conveying the land to Graffam. This note belonged to the Idaho Investment Company, and was given for the purchase price of the Idaho land. She was to pay the mortgage (which was on her land)." He testified that he then wrote the following on a piece of paper, and pasted it on an envelope in which were inclosed the deed executed by Mrs. Kersey, the note and contract executed by James Kersey to the Idaho Investment Company, and a deed which the Idaho Investment Company agreed to deliver to James Kersey conveying the Idaho land: "Note $792, James B. and Sarah J. Kersey. Deed Idaho Inv. Co. to James B. and Sarah J. Kersey; 80 acres, Sec. 17, 1 So. 15 E., B. M., Blaine Co., Idaho. To be delivered to Jane Kersey on satisfaction $225 mortgage to Union Central Life L. Co., Book 4R, pg. 438-9. June 27, 1903." He testified that this memorandum was signed by Jane Kersey (by signing her mark), the Idaho Investment Company, and V. S. Graffam. The witness further testified: That thereafter the envelope (containing the deed executed by the deceased, the note and contract executed by James Kersey to the Idaho Investment Company, and a deed which the Idaho Investment Company had executed to James Kersey) was delivered to Graffam; that thereafter Graffam, at the request of the Idaho Investment Company, executed a conveyance of the deceased's property to it; that thereafter the Idaho Investment Company sold the property to the respondent; that the witness tore up the deed which Graffam had made to the Idaho Investment Company and requested Graffam to execute a conveyance direct to the respondent, which Graffam did. It is in virtue of these transactions as testified to by this witness that the respondent claims title to the land. The claim made in this respect, in

effect, is that the deceased sold her land to the Idaho Investment Company, who, in consideration of such conveyance, gave James Kersey credit on his note for the sum of $575 ($800 less the mortgage of $225), and that the deed was taken in Graffam's name as a matter of mere convenience. This contention is mainly based on the apparent contents of the written memorandum testified to by the president of the Idaho Investment Company, and which, he testified, was signed by the parties at the time the deed was made.

It is claimed by appellants that the alleged memorandum is spurious. There is evidence tending to show that when the deceased signed the deed and placed it in escrow, and left it with the Home Investment & Savings Company, she and Graffam signed a contract evidencing the terms of the sale. This is clearly indicated by the letter written to Blunt by the Home Investment & Savings Company wherein it is stated: "Mrs. Kersey, before she left, signed a contract of sale and placed in escrow her deed conveying possession to Mr. V. S. Graffam." This contract of sale is unaccounted for. It is urged by the appellants that the signatures of the deceased and Graffam which were subscribed by them to this contract of sale were subsequently, and without their consent, cut off and detached from the written contract by some one, and what appears to be the written memorandum testified to by the president of the Idaho Investment Company, was written above the signatures, and the signature of the Idaho Investment Company added. While there are some suspicious circumstances attending the memorandum warranting a close scrutiny of it, still it is unnecessary to say whether appellant's contention in this regard is, or is not, well founded. There is other sufficient evidence to show, and upon which we are well satisfied, that the alleged memorandum testified to by the president of the Idaho Investment Company was not signed by the deceased. The essential elements and transactions concerning which the recitals of the memorandum relate are disputed by every witness in the case, including the president of the Idaho Investment Company. The recitals of the mem-

orandum are disputed by the heirs of the deceased and by Graffam, and are inconsistent with the letters written to Blunt and the deceased by the Home Investment & Savings Company, the company with whom it is conceded the deceased transacted her business and left her deed, and are at war with all the attending facts and circumstances. Even the testimony of the president of the Idaho Investment Company, as well as all the other evidence in the case, shows that the deceased did not sell her property to that company, but to Graffam; that he agreed to pay $800 for it; that he did not pay anything for it, the $200 paid by him having been returned; and that because he made the claim that he did not get immediate possession he repudiated his contract of purchase.

All the evidence in the case shows that the deceased was the seller, and Graffam the buyer, and notwithstanding he did not pay anything for the property, and that he repudiated the purchase contract, the deed was nevertheless delivered to him. We think it manifestly appears by the clear weight of the evidence that the deceased did not agree to have the proceeds of the sale of her land applied to the payment of the contract existing between her son and the Idaho Investment Company. The contract made by him was executed about three months before the deceased made her deed. His contract called only for monthly payments of $8 each, without security. When the deceased made her deed, he had made three payments of $8 each on his contract. There were no unpaid payments due at that time. The deceased had no interest in that contract. No payment had been demanded or requested. There is evidence tending to show that, when the deceased made her deed to Graffam, the contract which her son had made with the Idaho Investment Company did not enter into the negotiations and was not a subject discussed or referred to by any one. This evidence is not disputed except by the testimony of the president of the Idaho Investment Company, who testified that, while the negotiations were being conducted in his office, but in which he had no participation, Hardy called to him and said that Mrs. Kersey, who was

then present, wanted to know if the contract which she had made with Graffam, or the proceeds of the sale of her land, could be applied on her son's contract. The evidence further, without conflict, shows that after the deceased and her son arrived in Idaho, and after he there visited the land which he had agreed to purchase from the Idaho Investment Company, he made the claim that the character of the land had been misrepresented and demanded a return of the $24 paid by him and reimbursement of his expenses, and refused to make further payments on his contract. No claim was then made by the Idaho Investment Company, or by any one else, that $575 had been credited on his note and contract because of the deed which his mother had made to Graffam, or that he had any credit excepting the sum of $24. The deed which Graffam made to the respondent was in September or October, 1905. The deceased made her deed to Graffam in June, 1903. During that time, a period of over two years, neither Graffam nor the Idaho Investment Company exercised any ownership over the property, nor did either attempt to do so, nor did either demand possession of it. During all that time the deceased, or her heirs, was in possession of the land occupying and exercising ownership over it.

Upon all the evidence we are of the opinion that the deed which the deceased made was placed in escrow as contended for by the appellants, was not to be delivered until the purchase price agreed to be paid by Graffam was paid, and that it was delivered to him in violation of such agreement. We are further of the opinion that the respondent was not an innocent purchaser for value. She lived within a quarter of a mile of the deceased's property. At the time she claims to have purchased it she knew that neither Graffam nor the Idaho Investment Company ever had possession of the property or exercised any kind of ownership over it, and that the appellants, or some of them, were in the possession of the property and were and had been exercising acts of ownership over it. When she obtained her deed, she made no attempt to obtain possession until a con-

siderable time thereafter. The only consideration paid by her was the giving of a mortgage on the property.

The judgment of the court below is reversed, and the cause remanded to the trial court, with directions to vacate the judgment heretofore entered and to make findings and enter a judgment in favor of the appellants quieting the title of the land in them as prayed for in their answer and counterclaim.

Cost to appellants.

FRICK and McCARTY, JJ., concur.